660 F.Supp. 114 (1987)
LIBERTY LIFE INSURANCE CO., Plaintiff,
v.
Donald R. SCHAFFER and Valerie Schaffer, Defendants.
No. S85-0169C.
United States District Court, E.D. Missouri, Southeastern Division.
March 3, 1987.
*115 Richard A. Oertli, Eric M. Schmitz, Armstrong, Teasdale, Kramer, Vaughan & Schlafly, St. Louis, Mo., for plaintiff.
James E. Reeves, Ward & Reeves, Caruthersville, Mo., Charles Sampson Williams, Welman, Beaton, Williams & McVey, Kennett, Mo., for defendants.

MEMORANDUM
WANGELIN, District Judge.
This matter is before the Court for a decision on the merits following a three-day trial ending October 29, 1986. Plaintiff seeks declaratory judgment that it is not liable under two life insurance policies on the grounds of misrepresentation and non-accidental death.
After consideration of the testimony adduced at trial, the exhibits introduced into evidence, the briefs of the parties, and the applicable law, the Court hereby makes the following findings of fact and conclusions of law. Any finding of fact equally applicable as a conclusion of law is hereby adopted as such, and any conclusion of law equally applicable as a finding of fact is hereby adopted as such.

FINDINGS OF FACT
1. Plaintiff, Liberty Life Insurance Company (hereinafter referred to as Liberty), is, and at all times material to this action has been, a corporation organized under the laws of South Carolina, with its principal place of business in South Carolina.
2. Dr. Donald Schaffer (hereinafter referred to as the "insured") was the son of defendant D.R. Schaffer (hereinafter referred to as the "father"), and the husband of defendant Dr. Valerie Schaffer (hereinafter referred to as the "wife"), and both are and at all times pertinent were citizens of the State of Missouri; and the amount in controversy exceeds Ten Thousand Dollars ($10,000.00), exclusive of costs and interest.
3. The insured was a licensed physician specializing in obstetrics and gynecology. His wife was and is a licensed physician engaged in general practice. Both practiced medicine at Kennett, Missouri.
4. The wife and father each had owned a Metropolitan Life Insurance policy insuring the life of the insured in the face amount of Two Hundred Fifty Thousand Dollars ($250,000.00). The father's policy had an accidental death benefit of Two Hundred Thousand Dollars ($200,000.00); the wife's did not. The Metropolitan policies were issued in 1981 and 1982 and had the identical coverages as the Liberty policies in this action. Both Metropolitan policies were more than two years old and, therefore, were incontestable on the grounds of misrepresentation concerning the insurability of the insured.
5. On or about July 30, 1984, the insured executed Parts I and II of an Application for Life Insurance from Liberty Life Insurance Company, naming his father as the primary and sole beneficiary. His father signed the application as the agent witness.
6. On or about July 30, 1984, the insured executed "Medical Part II of Application for Insurance in Liberty Life Insurance Company." His wife signed the medical application as a witness.
7. On or about July 30, 1984, the wife executed "Part IIIMedical Examiner's Report" of the insured's application, and the father executed an Agent's report.
8. Liberty refused to accept the insured's Medical Examiner's Report because *116 the exam was performed and report issued by the insured's wife.
9. On or about September 1, 1984, the insured executed a second "Medical Part II of Application for Insurance in Liberty Life Insurance Company."
10. On or about September 1, 1984, Dr. Otis A. Plunk executed a second "Part IIIMedical Examiner's Report" of the Application of the insured.
11. Plaintiff Liberty Life issued, on or about October 9, 1984, policy number CF10059916, which provided the insured with a face amount of Two Hundred Fifty Thousand Dollars ($250,000.00) in life insurance and an additional Two Hundred Thousand Dollars ($200,000.00) in accidental death benefits. The policy named the father as the sole beneficiary. (This policy shall be referred to as the "father's policy.")
12. On or about November 15, 1984, the insured executed Part I of a second Application for Life Insurance from Liberty Life Insurance Company, naming his wife as primary beneficiary and his father as contingent beneficiary. The father signed the application as the Agent witness and issued an "Agent's Report."
13. Plaintiff Liberty Life issued, on or about December 5, 1984, policy number CF10069238, which provided insured with a face amount of Two Hundred Fifty Thousand Dollars ($250,000.00). (This policy shall be referred to as the "wife's policy.")
14. On or about April 10, 1985, the insured died by means of a self-inflicted gunshot wound. (Stipulated).
15. Both the father and wife, as designated beneficiaries, made claims against Liberty.
16. Rather than executing a letter of denial, Liberty instituted this action seeking declaratory judgment.
17. Both policies (defendant's Exhibits A & B) had attached to the policies only one page of the application, Part I, consisting of a front and back signed by the insured and witnessed by the father. Neither policy had attached to it at the time of its issue or thereafter Medical Part II nor Part III, Medical Examiner's Report, nor the Agent's Report.
18. Both insurance policies contained the following provision:
(a) Entire ContractThis policy and the application, (including supplemental), copies of which are attached, form the entire contract. In the absence of fraud, all statements made by or for you are considered representations and not warranties. No statement will be used to contest this policy or in defense of a claim unless it is in the application. Only our president, a vice-president, the secretary, or an assistant secretary may change, modify or waive the provisions of this policy and then only by written agreement.
19. Liberty had pleaded fraud and false representation in the insured's negative answers to the following questions in Part I of the applications:
1. Has any person named (give details in # 5)
(a) Had a case of diabetes, heart trouble, or mental illness in the family?
2. Has any person named ever had any of the following? If yes, indicated by () and give details in # 5.
(b) Gall bladder disease, heart disease, hemorrhage, indigestion, kidney trouble, liver trouble, mental illness or any disease * * *
3. Is any person named now receiving any treatment or medication? (If yes, describe)
5. Details of medical treatment in the last 5 years for all persons named for coverage: (If none, so state)
20. Medical Part II, Medical Examiner's Part III, and the Agent's Report are not and never were attached to the policy; and under the express terms of the insurance contract, Liberty agreed not to use any such statements to contest the policy.
21. The insured and his wife were married in November of 1981. While they were living in Newport, Arkansas in 1983, the insured lost his staff privileges at the local hospital. As a result of stress and anxiety in regard to this and other problems *117 with local doctors, the insured experienced a period of rapid heartbeat and went to a local hospital for a period of hours on October 13, 1983.
22. The insured, his wife, and baby daughter moved to Kennett, Missouri in February of 1984. During the summer of 1984 and also in November of 1984, the insured was working long hours due to the nature of his specialty. He enjoyed his work and had little time for leisure activities. During this period of time he was well groomed and conscious of his personal appearance. In July of 1984, the insured had not been treated for excessive use of any habit-forming drug and had not had any known indication of excessive use of any habit-forming drugs. Although she never saw the insured take any controlled substances during their marriage, the wife thought that the insured was using some controlled substance in July of 1984 because of his effort to keep up with his extensive work schedule. Based on what ultimately transpired in events leading up to the insured's suicide, she presently believes that the insured's use of such substances in July of 1984 was probably excessive.
23. Approximately two months before the insured's suicide, his appearance and behavior began to change. He was no longer careful about his personal appearance, and there was a decrease in his hygiene.
24. In June of 1985, the wife became aware that an investigator hired by Liberty would be questioning her in regard to the death of the insured and the claim she had made under her Liberty policy. She talked to the father of the insured, and he told her if she was asked if the insured used drugs to say "no." The insured never admitted any drug use to the father, and the father refused to believe such about his son. The investigator hired by Liberty questioned her at her home in the presence of her three-year old daughter. The investigator's report states that she was "very emotional." The investigator wrote out answers given by the wife without indicating the questions that he asked. The wife did not respond with candor to a number of matters. While not condoning the wife's actions in this regard, the Court does not find anything to negatively affect the overall credibility of the wife. The Court further finds that no statements made by the wife in any way hampered the post death investigation of the defendants' claims by Liberty.

ISSUES TO BE DETERMINED
1. Whether defendants and/or the insured made material misrepresentations to plaintiff concerning the insured's health, and whether the conditions which were allegedly misrepresented contributed in a material way to the insured's death.
2. Whether the insured's death was accidental.
3. Whether plaintiff's refusal to honor the insurance policies was vexatious.

CONCLUSIONS OF LAW
This action is between citizens of different States, and the amount in controversy exceeds Ten Thousand Dollars ($10,000.00). Therefore, this Court exercises jurisdiction pursuant to 28 U.S.C. § 1332.
The threshold issue to be determined is whether defendants or the insured made material misrepresentation to plaintiff concerning the insured's health, and whether the conditions which were allegedly misrepresented contributed in a material way to the insured's death. For the reasons stated below, the Court responds to this issue in the negative.
First, the Court finds that there were no material misrepresentations made. The Court bases this finding on its belief that defendants answered the questions in Part I of the applications truthfully, to the best of their knowledge and ability. The Court finds defendant Valerie Schaffer's testimony credible that the insured had consulted a psychiatrist only once or twice as a result of a colleague's problems during medical school, and that the insured did not have a mental disease nor had he been treated for one.
*118 Moreover, the Court finds that the insured's brief hospitalization for complaints of rapid heartbeat was so insignificant to give rise to defendant's deep-felt belief that the insured did not have heart trouble or disease. The fact that the insured never complained of a rapid heartbeat again lends support to the conclusion that the episode was a one-time, stress induced cardiac variation and not heart disease. Therefore, defendant's negative response to questions concerning heart disease or trouble were not misrepresentations.
Finally, the insured was not receiving medication or treatment for any infirmity. Thus, defendant's negative response to said question was absolutely truthful. Although it appears that the insured may have been ingesting controlled substances at the time of the application, there is no evidence that defendants knew of the insured's problem, or in fact that the insured knew of his problem.
Second, even if defendants' responses to the insurance application questions could be characterized as material misrepresentations, the conditions which were misrepresented did not contribute in a material way to the insured's death. The insured died from a self-inflicted gunshot wound to the head.
Liberty seeks to avoid liability based upon alleged misrepresentations as to the insured's mental and physical condition. Liberty's theory is that had it known about insured's mental and physical condition it would not have issued the policies. Plaintiff's argument would be much more persuasive if it had introduced evidence of even one instance of refusing to insure based upon one isolated cardiac variation and the taking of amphetamines. However, plaintiff merely states that it would have refused to issue insurance on insured's life. Plaintiff's hindsight is very convenient in that now plaintiff faces the prospect of substantial liability on the insurance contracts it issued.
It has long been the rule in Missouri life insurance law that mental and physical infirmities, which are at best the remote causes of death, will not defeat recovery under a life policy where the immediate cause of death is within the coverage of the insurance policy. See, Lindman v. General American Life Insurance Company, 485 S.W.2d 477 (Mo.App.1972). In the instant case, the insured's condition may have contributed to the insured's decision to take his own life; however, the insured's life was directly terminated by a gunshot to the head. This death producing event is covered by Liberty's insurance contracts.
Third, Liberty is equitably estopped from denying liability on the grounds of misrepresentation as to insured's mental or physical condition. The three elements of equitable estoppel in Missouri are: (1) Statements or conduct by one party calculated to induce reliance by another; (2) reliance by the other party; and (3) injury to the other party when the first party acts in a manner inconsistent with its original conduct or statements. Peerless Supply Co. v. Industrial Plumbing & Heating Co., 460 S.W.2d 651, 666 (Mo.1970); Brooks v. Cooksey, 427 S.W.2d 498, 504 (Mo.1968). The facts in this case provide a classic example of conduct by Liberty which should estop it from denying liability on its policies.
Prior to 1984, the father was an agent for Metropolitan Life and had obtained two Metropolitan policies insuring the life of his son, the insured, containing identical coverages as involved in this case. Both of these policies were incontestable on the grounds of misrepresentations contained in the applications. The father traveled to the headquarters of Liberty where he met with executives and officers of Liberty who were former Metropolitan officers and agents, with whom the father was acquainted. These officers assured him that the new policies would be as good or better than the old policies; and, relying on these assurances, the father caused these Metropolitan policies to be "rolled over" or replaced by Liberty's policies. Liberty cannot be allowed to make assurances that the new policies are as good or better than the old policies and also benefit from the inconsistent position that the new policies are contestable when the old policies were incontestable. *119 See also, Trainor v. John Hancock Mutual Life Ins. Co., 54 N.Y.2d 213, 429 N.E.2d 759, 445 N.Y.S.2d 81 (1981), in which the Court held, "that an insurer was precluded from raising a defense of misrepresentation because of its conduct in soliciting replacement policies without explaining that the insured would lose the protection of a two-year incontestability clause on the original policy." The Court concludes that the same result should be reached here, and holds that Liberty is equitably estopped and precluded from asserting misrepresentation as a defense under the policies.
Fourth, Liberty's misrepresentation defense must fail because Liberty did not, in fact, rely on defendants' application answers. Initially Liberty refused to accept the medical examination performed by the wife. Liberty insisted on a second examination performed by an independent physician. Then, prior to the issuance of the policies, Liberty conducted its own independent inquiry.
The mere fact that Liberty made an independent investigation in order to test the truth of representations made by defendants does not absolve defendants from telling the truth nor lessen Liberty's right to rely on defendants' representations. However, if an investigation made with reasonable diligence would have disclosed the falsity of the defendants' statements, then Liberty is estopped from relying on any alleged misrepresentation to avoid the policies. See, Apperson v. U.S. Fidelity & Guaranty Co., 318 F.2d 438, 441 (5th Cir. 1963).
In this instance, Liberty sent investigators to both Kennett, Missouri and Newport, Arkansas. Even a routine check at the hospital at Newport would have uncovered the insured's brief hospitalization and possibly even uncovered his social problems relating to other professionals and use of amphetamines. Although it is not clear what the investigators did while in Newport and Kennett, it is clear that a diligent investigation would have disclosed the apparent falsity of some of defendant's representations. The Court finds that Liberty did not rely on defendants' representations and cannot equitably be allowed to avoid the policies in light of its independent investigation.
The second issue to be determined is whether the insured's death was accidental. The Court responds to this issue in the negative.
The father's policy contained an accidental death provision which allows coverage on suicide if the suicide is committed while the insured is insane. There was testimony from both sides of this issue, and the Court must determine which testimony is credible.
The Court finds that the insured was experiencing many difficulties, both personally and professionally. The insured had lost his license to prescribe drugs and appeared to be on the verge of losing his hospital privileges. Further, he was experiencing problems at home, and it now seems clear that his use of amphetamines was excessive. It is the Court's opinion that the insured made a rational and informed assessment of his personal and professional situation and determined that suicide was the best available alternative. The Court cannot speculate as to the merits of the insured's decision, but the Court is convinced that the insured was sane at the time he decided to take his own life. Therefore, Liberty is not liable under the accidental death provision of the father's policy.
Finally, the Court considers whether Liberty is liable for the penalty for vexatious refusal to pay death benefits as provided by Section 375.420 Mo.R.S. (1987 Cum update). The Court answers this issue in the affirmative.
Missouri Revised Statute Section 375.420 provides as follows:
"In any action against any insurance company to recover the amount of any loss under a policy of automobile, fire, cyclone, lightning, life, health, accident, employers' liability, burglary, theft, embezzlement, fidelity, indemnity, marine or other insurance except automobile liability insurance, if it appears from the evidence *120 that such company has refused to pay such loss without reasonable cause or excuse, the court or jury may, in addition to the amount thereof and interest, allow the plaintiff damages not to exceed twenty percent of the first fifteen hundred dollars of the loss, and ten percent of the amount of the loss in excess of fifteen hundred dollars and a reasonable attorney's fee; and the court shall enter judgment for the aggregate sum found in the verdict."
Under Missouri law, the mere failure to furnish a written denial specifying the grounds for denial is a sufficient reason to invoke the penalty. Hounihan v. Farm Bureau, 523 S.W.2d 173 (Mo.App. 1975). In the instant case however, Liberty violated a significant number of sections of the Unfair Practices and Frauds Statute. Mo.R.S. § 375.936 (1978). Sub-section 10 of the Statute defines the following as being unfair:
"(b) Failing to acknowledge and act reasonably promptly considering all the circumstances upon written or oral communications with respect to claims arising under insurance policies;
* * * * * *
(e) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed and communicated to the company or its representative;
* * * * * *
(n) Failing to promptly provide, in relation to the facts or applicable law, a reasonable explanation, based on the insurance policy, for denial of a claim or for the offer of compromise settlement;"
* * * * * *
Pursuant to this Statute, the Missouri Director of Insurance has adopted regulations concerning unfair claim settlement practices. These are found at 4 CSR 190-10.060. Sub-sections 4, 5 and 6 thereof provide the following:
"(4) Failure to Acknowledge Pertinent Communications.
(A) Every insurer, upon receiving notification of claim from any first-party claimant shall, within ten (10) working days, acknowledge the receipt of such notification unless payment is made within such period of time.
* * * * * *
(C) An appropriate reply shall be made within ten (10) working days on all other pertinent communications from any claimant which reasonably suggest that a response is expected.
* * * * * *
(5) Standards for Prompt Investigation of Claims. Every insurer shall complete investigation of a claim within thirty (30) days after notification of claim, unless such investigation cannot reasonably be completed within such time.
(6) Standards for Prompt, Fair and Equitable Settlements Applicable to All Insurers.
(A) Within fifteen (15) working days after the submission of all forms necessary to establish the nature and extent of any claim, the first-party claimant shall be advised of the acceptance or denial of the claim by the insurer. No insurer shall deny any claim on the grounds of a specific policy provision, condition, or exclusion unless reference to such provision, condition or exclusion is included in the denial. The denial must be given to the claimant in writing and the claim file of the insurer shall contain a copy of the denial.
(B) If a claim is denied for reasons other than those described in subsection (6)(A), an appropriate notation shall be made in the claim file of the insurer.
(C) If the insurer needs more time to determine whether a claim should be accepted or denied, it shall so notify the first party claimant within the time allotted for such acceptance or denial, giving the reasons more time is needed. If the investigation remains incomplete, the insurer shall, within forty-five (45) days from the date of the initial notification and every forty-five (45) days thereafter, send to such claimant a letter setting forth the reasons *121 additional time is needed for investigation."
The plaintiff has complied with none of these provisions. Clearly, plaintiff's refusal to pay any amount on the policies was without reasonable cause or excuse. In fact, plaintiff provided no information to defendants about their claims until the instant action was filed. If plaintiff had timely responded or only refused payment on the accidental death benefits, Liberty's actions could only be viewed as reasonable and within the perimeters of sound business judgment. However, in light of Liberty's unconscionable conduct, the Court finds that defendants are entitled to the vexatious penalties as provided by Section 375.420 Mo.R.S.

CONCLUSION
Based on the foregoing, the Court finds that plaintiff Liberty Life Insurance Company is liable to defendant Donald R. Schaffer in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) for the principal death benefit, together with interest thereon at nine percent (9%) per annum, the Missouri Statutory Rate, from June 12, 1985, which the Court finds to be thirty (30) days after the claims were presented to Liberty and due to be paid under the terms of the policy. Further, plaintiff is liable to defendant Donald R. Schaffer for the sum of twenty percent (20%) on the first Fifteen Hundred Dollars ($1,500.00) of the policy amount of Two Hundred Fifty Thousand Dollars ($250,000.00) and ten percent (10%) on the amount over Fifteen Hundred Dollars ($1,500.00); and for attorney fees of Fifty Thousand Dollars ($50,000.00); a total of Three Hundred Twenty-Five Thousand One Hundred Fifty Dollars ($325,150.00), plus interest and costs. The Court finds that plaintiff is not liable to defendant Donald R. Schaffer for the accidental death benefits as provided in his policy.
Further, the Court finds that plaintiff Liberty Life Insurance Company is liable to defendant Valerie Schaffer in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) for the principal death benefit, together with interest thereon at nine percent (9%) per annum, the Missouri Statutory Rate, from June 12, 1985, which the Court finds to be thirty (30) days after the claims were presented to Liberty and due to be paid under the terms of the policy; the sum of twenty percent (20%) on the first Fifteen Hundred Dollars ($1,500.00) of the said Judgment, and ten percent (10%) on the amount over Fifteen Hundred Dollars ($1,500.00) of the said Judgment; and attorney fees of Fifty Thousand Dollars ($50,000.00); a total of Three Hundred Twenty-Five Thousand One Hundred Fifty Dollars ($325,150.00), together with interest and costs.
A formal Judgment in accordance with these Findings of Fact and Conclusion of Law will be entered.
IT IS SO ORDERED.

JUDGMENT
In accordance with the Memorandum filed this date and incorporated herein,
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that defendant Donald R. Schaffer have judgment against plaintiff Liberty Life Insurance Company on Liberty's complaint, and in favor of defendant Donald R. Schaffer against plaintiff Liberty on defendant's counterclaim, in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) for the principal death benefit; together with interest thereon at nine percent (9%) per annum, the Missouri Statutory Rate, from June 12, 1985, which the Court finds to be thirty (30) days after the claims were presented to Liberty and due to be paid under the terms of the policy; the sum of twenty percent (20%) on the first Fifteen Hundred Dollars ($1,500.00) of the said Two Hundred Fifty Thousand Dollars ($250,000.00), and ten percent (10%) on the amount over Fifteen Hundred Dollars ($1,500.00); and attorney fees of Fifty Thousand Dollars ($50,000.00); a total of Three Hundred Twenty-Five Thousand One Hundred Fifty Dollars ($325,150.00), together with interest and costs.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that defendant *122 Valerie Schaffer had judgment against plaintiff Liberty Life Insurance Company on Liberty's complaint and in favor of defendant Valerie Schaffer and against plaintiff on defendant's counterclaim in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) for the principal death benefit; together with interest thereon at nine percent (9%) per annum, the Missouri Statutory Rate, from June 12, 1985, which the Court finds to be thirty (30) days after the claims were presented to Liberty and due to be paid under the terms of the policy; the sum of twenty percent (20%) on the first Fifteen Hundred Dollars ($1,500.00) of the said Two Hundred Fifty Thousand Dollars ($250,000.00), and ten percent (10%) on the amount over Fifteen Hundred Dollars ($1,500.00); and attorney fees of Fifty Thousand Dollars ($50,000.00); a total of Three Hundred Twenty-Five Thousand One Hundred Fifty Dollars ($325,150.00), together with interest and costs.
IT IS SO ORDERED.